### UNITED STATES DISTRICT COURT
### DISTRICT OF MARYLAND

RONY SANTAMARIA ORELLANA,

    Petitioner,

    v.

NIKITA BAKER,
*in her official capacity as Director of the*
*Baltimore Field Office,*
*U.S. Immigration and Customs Enforcement,*
TODD LYONS,
*in his official capacity as Acting Director of*
*U.S. Immigration and Customs Enforcement,*
KRISTI NOEM,
*in her official capacity as*
*Secretary of Homeland Security,*
U.S. DEPARTMENT OF
HOMELAND SECURITY and
U.S. IMMIGRATION AND
CUSTOMS ENFORCEMENT,

    Respondents.

Civil Action No. 25-1788-TDC

### MEMORANDUM OPINION

Petitioner Rony Santamaria Orellana ("Santamaria Orellana"), who is currently in immigration detention, has filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241 against Respondents Nikita Baker, the Director of the Baltimore Field Office of United States Immigration and Customs Enforcement ("ICE"); Todd Lyons, Acting Director of ICE; Secretary of Homeland Security Kristi Noem; the United States Department of Homeland Security ("DHS"); and ICE. In the Petition, Santamaria Orellana seeks immediate release on the grounds that his detention violates the Due Process Clause of the Fifth Amendment to the United States Constitution, the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551–559, 701–706, the

Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101–1537, and the INA's implementing regulations. After briefing, the Court held an evidentiary hearing on the Petition on August 18, 2025. For the reasons set forth below, the Petition will be GRANTED.

## BACKGROUND

Santamaria Orellana, who was born in March 1984, is a native and citizen of El Salvador. He has no claim to citizenship, permanent residence, or legal immigration status in any country other than El Salvador. After he entered the United States on an unknown date without inspection, Santamaria Orellana was apprehended and issued an order of removal on June 9, 2006. In September 2008, presumably after removal to El Salvador, Santamaria Orellana fled from El Salvador after facing death threats from Salvadoran gangs and entered Mexico unlawfully. Santamaria Orellana was apprehended by Mexican immigration officials, detained for a few weeks, and deported back to El Salvador. Later that same month, Santamaria Orellana left El Salvador and re-entered the United States without inspection. He then settled in Maryland, where he has since resided with his longtime girlfriend. Santamaria Orellana is the father of five children, three of whom are United States citizens.

On November 25, 2019, Santamaria Orellana was arrested by ICE agents, denied bond, and placed in immigration proceedings after which he was found to have a reasonable fear of persecution or torture if removed to El Salvador. On December 30, 2019, Santamaria Orellana was granted bond by an immigration judge, and he was released on January 6, 2020. On April 17, 2023, Santamaria Orellana was granted withholding of removal under the Convention Against Torture ("CAT Withholding") by an immigration judge, who concluded that Santamaria Orellana would more likely than not be subjected to torture with the acquiescence of a public official if removed to El Salvador.

2

In May 2023, Santamaria Orellana's cousin, who had posted his bond, received a "Notice to Obligor to Deliver Alien" that instructed her to bring Santamaria Orellana to ICE's Baltimore Field Office on June 5, 2023. Santamaria Orellana Aff. ¶ 9, Reply Ex. A, ECF No. 12-1. On that date, Santamaria Orellana appeared at that office and was informed that his case with ICE was "not complete" and that he would be placed under supervision. *Id.* As part of that supervision, Santamaria Orellana was required to check in at a kiosk every year.

In 2024, Santamaria Orellana returned to the Baltimore Field Office to check in with ICE using the kiosk, but the kiosk did not accept his information, so he requested assistance from an ICE officer. The officer asked whether Santamaria Orellana had encountered any problems with the law since his last check-in, to which Santamaria Orellana responded "no." *Id.* Santamaria Orellana was then given another check-in date, June 4, 2025, and permitted to leave.

On June 4, 2025, Santamaria Orellana returned to the Baltimore Field Office to check in. Once again, the kiosk did not accept his information. Santamaria Orellana was then told to wait for an ICE officer, who would provide assistance. After ICE officers arrived and looked at Santamaria Orellana's paperwork, they appeared confused. They then took Santamaria Orellana to the back of the office. At that point, Santamaria Orellana asked whether the ICE officers were detaining him, to which they responded "yes." *Id.* ¶ 10. Santamaria Orellana was then placed in the detention holding room, where he was given a notice stating that ICE intended to deport him to a third country, specifically Mexico. Santamaria Orellana asserts that at no time after he was granted CAT Withholding did he commit any crimes, miss any check-in appointments, or disobey any instructions from ICE. He further states that at no point after he was granted CAT Withholding did ICE ask him to request travel documents from any third country.

3

At no point, whether at the time of his re-detention or thereafter, has Santamaria Orellana received any notification of the reasons for the revocation of his release or any information on the identity or position of the ICE official who authorized that revocation. Indeed, at the evidentiary hearing on the Petition, Respondents' counsel was not aware of any documentation containing such information.

On June 5, 2025, Santamaria Orellana filed the present Petition while still detained in Maryland. He was subsequently transferred to an ICE processing center in Conroe, Texas. At no point since the revocation of his release has Santamaria Orellana received an informal interview or other means by which he received an opportunity to be heard in response to the reasons for revocation.

Following his detention at the Baltimore Field Office, and no later than June 6, 2025, Santamaria Orellana expressed to ICE a fear of removal to Mexico, both directly and through counsel. However, as of the August 18, 2025 hearing on the Petition, ICE had not provided him with an interview to assess whether he has a reasonable fear of such a removal. The Court was informed, however, that on or about August 16, 2025, over two months after the re-detention of Santamaria Orellana and only two days before the hearing, ICE referred his case to United States Citizenship and Immigration Services to conduct an interview on the issue of whether he has such a reasonable fear.

On June 4, 2025, the date that Santamaria Orellana's release was revoked, ICE sent a Request for Acceptance of Alien to the Mexican Embassy in Washington, D.C. requesting that Mexico accept the removal of Santamaria Orellana to that country. At the hearing, Francisco Madrigal, the Deputy Assistant Director for the Field Operations Division of ICE's Enforcement and Removal Operations for the Western Region, testified that he does not know whether ICE has

4

received a response to that request. Madrigal further testified that, from July 9, 2025 to July 31, 2025, Mexico had placed a "pause" on accepting removals of individuals from third-party countries, but that, as of July 31, 2025, that pause has been lifted. Madrigal, however, was unable to provide any assessment of the likelihood that Mexico would accept Santamaria Orellana. At the same time, Madrigal asserted that if the Court's present stay order was lifted and Mexico provided notice of its acceptance, ICE would remove Santamaria Orellana to Mexico in "a matter of days."

## DISCUSSION

In his Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2241, Santamaria Orellana seeks release from ICE detention. As relevant here, § 2241 provides that a district court may grant a writ of habeas corpus if a prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2241(c)(3). Santamaria Orellana argues that he should be released because his detention violated his due process rights under the Fifth Amendment to the Constitution, the APA, the INA, and the INA's implementing regulations. Specifically, he asserts a violation of due process on the grounds that (1) the revocation of his release was effected without compliance with applicable regulations, in violation of principles set forth in *United States ex rel. Accardi v. Shaughnessy* ("*Accardi*"), 347 U.S. 260 (1954); and (2) it is not reasonably foreseeable that he will be removed to Mexico or any other country, in violation of due process rights articulated in *Zadvydas v. Davis*, 533 U.S. 678 (2001).

## I. *D.V.D. v. U.S. Department of Homeland Security*

In their Answer, as a threshold issue, Respondents argue that this case should be dismissed or stayed in light of *D.V.D. v. U.S. Department of Homeland Security*, No. 25-10676-BEM, 2025 WL 1142968 (D. Mass. Apr. 18, 2025), a case in which the court granted a preliminary injunction

5

relating to a certified class of individuals who are presently subject to a final notice of removal and who DHS "has deported or will deport on or after February 18, 2025, to a country (a) not previously designated as the country or alternative country of removal, and (b) not identified in writing in the prior proceedings as a country to which the individual would be removed." *Id.* at *11, *25. The preliminary injunction directed that certain procedural steps occur before any removal of a class member to a third country. *Id.* at *24. Since the filing of the Petition, however, that preliminary injunction has been stayed by the United States Supreme Court. *See Dep't of Homeland Security v. D.V.D.*, 145 S. Ct. 2153, 2153 (2025). Moreover, even if Santamaria Orellana is a member of the certified class in *D.V.D.*, in the Petition, he is not seeking relief relating to the execution of his removal to a third country but instead seeks relief only from his present detention. The Court will therefore not address Respondents' arguments based on *D.V.D.*

## II.    8 U.S.C. § 1252(g)

In the Answer, Respondents also argue that "[t]o the extent Petitioner asks this Court to enter an order staying ICE's effectuation of Petitioner's removal order," this Court lacks jurisdiction to offer such relief pursuant to 8 U.S.C. § 1252(g). Ans. at 13, ECF No. 11. That provision provides in relevant part:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory), including section 2241 of Title 28, or any other habeas corpus provision, and sections 1361 and 1651 of such title, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

8 U.S.C. § 1252(g). As Respondents acknowledge, however, Santamaria Orellana does not ask this Court to enter an order staying ICE's execution of his removal order. Rather, Santamaria Orellana challenges the legality of his detention pending the effectuation of his removal order. This Court has jurisdiction to evaluate this challenge. *See Zadvydas*, 533 U.S. at 688 (noting that

6

when a petitioner challenges "the extent of the Attorney General's authority under the post-removal-period detention statute," § 2241 habeas proceedings are available for "statutory and constitutional challenges" to such detention).

## III.    Violation of Regulations

In the Petition, Santamaria Orellana asserts that his detention violates due process because, in effectuating that detention, Respondents failed to comply with their own regulations governing the revocation of release previously granted to an individual subject to a removal order.

### A.    Legal Framework

The parties agree that Santamaria Orellana is detained pursuant to 8 U.S.C. § 1231(a), which generally provides that when noncitizens are issued an order of removal, they are subject to mandatory detention and required to be removed within 90 days, a time frame known as "the removal period." *See* 8 U.S.C. § 1231(a)(1)(A) ("Except as otherwise provided in this section, when an alien is ordered removed, the Attorney General shall remove the alien from the United States within a period of 90 days."); 8 U.S.C. § 1231(a)(2)(A) ("During the removal period, the Attorney General shall detain the alien."). If an individual is not deported within the removal period, that person, "pending removal, shall be subject to supervision under regulations prescribed by the Attorney General." 8 U.S.C. § 1231(a)(3). Certain "[i]nadmissible or criminal aliens," including those deemed inadmissible under 8 U.S.C. § 1182 based on their presence in the United States without having been admitted or paroled, as well as those noncitizens deemed to be "a risk to the community or unlikely to comply with the order of removal," may be detained beyond the removal period, but if they are released, they "shall be subject to the terms of supervision" applicable under 8 U.S.C. § 1231(a)(3). 8 U.S.C. § 1231(a)(6).

7

Regulations promulgated pursuant to the INA govern the "authority to continue an alien in custody or grant release or parole under" 8 U.S.C. § 1231(a)(6). 8 C.F.R. § 241.4(a). Under these regulations, certain ICE officials are authorized to make determinations on whether to "continue an alien in custody beyond the removal period" based on certain factors enumerated in the regulations. 8 C.F.R. § 241.4(a), (c), (f). Alternatively, ICE could determine that an alien should be released upon consideration of certain criteria and factors set forth in the regulations. *See* 8 C.F.R. § 241.4(e), (f). Under the regulations, a copy of any decision by the "Executive Associate Commissioner," the "district director," or the "Director of the Detention and Removal Field Office" "to release or to detain an alien shall be provided to the detained alien," and any such detention decision must "briefly set forth the reasons for the continued detention." 8 C.F.R. § 241.4(d). A noncitizen who is ultimately released pursuant to these provisions "must abide" by "conditions or special conditions on release" imposed by ICE. 8 C.F.R. § 241.4(j)(1).

Such release may be revoked. Specifically, a noncitizen "who has been released under an order of supervision or other conditions of release" who then "violates the conditions of release may be returned to custody." 8 C.F.R. § 241.4(*l*)(1). Under this provision, "[u]pon revocation, the alien will be notified of the reasons for revocation of his or her release," after which "[t]he alien will be afforded an initial informal interview promptly after his or her return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." *Id.*

Furthermore, even absent a violation of conditions of release, the Executive Associate Director of ICE, and in limited instances, a district director of ICE, has the "authority, in the exercise of discretion, to revoke release and return to [ICE] custody an alien previously approved for release under the procedures in this section." 8 C.F.R. § 241.4(*l*)(2); *see Ceesay v. Kurzdorfer*,

8

No. 25-0267-LJV, 2025 WL 1284720, at *16 (W.D.N.Y. May 2, 2025) (noting that the reference in 8 C.F.R. § 241.4(*l*)(2) to the "Executive Associate Commissioner" now refers to the "Executive Associate Director of ICE"). Specifically:

> Release may be revoked in the exercise of discretion when, in the opinion of the revoking official:
>
> (i)    The purposes of release have been served;
>
> (ii)   The alien violates any condition of release;
>
> (iii)  It is appropriate to enforce a removal order or to commence removal proceedings against an alien; or
>
> (iv)   The conduct of the alien, or any other circumstance, indicates that release would no longer be appropriate.

8 C.F.R. § 241.4(*l*)(2).

Finally, the regulations provide "special review procedures" for "aliens who are subject to a final order of removal and are detained under the custody review procedures provided at [8 C.F.R.] § 241.4 after the expiration of the removal period, where the alien has provided good reason to believe there is no significant likelihood of removal to the country to which he or she was ordered removed, or to a third country, in the reasonably foreseeable future." 8 C.F.R. § 241.13(a). This regulation applies when ICE has made "a determination under this section that there is no significant likelihood of removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(b)(1). Once that determination has been made, the noncitizen is released subject to certain conditions of release. *See* 8 C.F.R. § 241.13(h). ICE may revoke that release upon a violation of conditions of release or if "changed circumstances" have led to a determination "that there is a significant likelihood that the alien may be removed in the reasonably foreseeable future." 8 C.F.R. § 241.13(i)(1), (2). To revoke such release, ICE must follow specific revocation procedures, including that (1) "[u]pon revocation, the alien will be notified of the reasons for

revocation"; (2) ICE "will conduct an initial informal interview promptly after . . . return to [ICE] custody to afford the alien an opportunity to respond to the reasons for revocation stated in the notification"; and (3) "[t]he alien may submit any evidence or information" to show that there is no "significant likelihood" of removal in the "reasonably foreseeable future," or that the alien "has not violated the order of supervision." 8 C.F.R. § 241.13(i)(3).

## B.   Revocation of Release

Santamaria Orellana argues that his re-detention violates his Fifth Amendment right to due process because Respondents failed to comply with the regulations governing "[c]ontinued detention of inadmissible . . . and other aliens beyond the removal period" set forth in 8 C.F.R. § 241.4. Specifically, Santamaria Orellana asserts that, in detaining him on June 4, 2025 and thereafter, ICE failed to provide him with any "prior notice or opportunity to respond," Pet. ¶ 24, ECF No. 1, consisting of notification of the reasons for revocation and an "initial informal interview promptly" after he was detained to provide an opportunity for him to "respond to" those stated reasons, in violation of 8 C.F.R. § 241.4 and 8 C.F.R. § 241.13. *Id.* ¶ 32. He also argues that there was a failure to comply with the requirement that a discretionary revocation of release must be made either by the "Executive Associate Commissioner" or by a district director when "circumstances do not reasonably permit referral of the case to the Executive Associate Commissioner." 8 C.F.R. § 241.4(*l*)(2). Santamaria Orellana argues that these regulations are designed to protect noncitizens' "liberty and property interests," so the failure to follow them "constitutes a per se violation of procedural due process." Pet. ¶ 42 (citing *Accardi*, 347 U.S. at 266–68).

The Supreme Court has recognized that a federal agency's failure to comply with its own regulations generally renders the associated agency action unlawful. *See Accardi*, 347 U.S. at 268.

10

In *Accardi*, the Court considered a habeas petition filed on behalf of an individual whose application for suspension of deportation had been denied by the Board of Immigration Appeals ("BIA"), which itself had affirmed a decision by the Commissioner of Immigration. *See id.* at 261, 263–64. The petition asserted that, in denying the application, the BIA had failed to follow its own regulation requiring it to "exercise its own judgment when considering appeals" because the Attorney General had included the petitioner on a list of "unsavory characters" that he planned to have deported, discussed the list at a press conference, and had the list circulated to the BIA and other relevant agencies before the BIA ruling, such that the matter had been effectively prejudged. *Id.* at 263–64, 266. The Supreme Court objected to the BIA's "alleged *failure to exercise* its own discretion, contrary to existing valid regulations" and remanded the case so that the petitioner could "receive a new hearing before the Board without the burden of previous proscription by the list." *Id.* at 268.

Today, the principle that "an agency's failure to afford an individual procedural safeguards required under its own regulations may result in the invalidation of the ultimate administrative determination" has come to be known as the "*Accardi* doctrine." *United States v. Morgan*, 193 F.3d 252, 266 (4th Cir. 1999). Since *Accardi*, the Supreme Court has added a further requirement that "claimants demonstrate prejudice resulting from the violation" in order to establish a due process violation. *Id.* at 267 (citing *Am. Farm Lines v. Black Ball Freight Serv.*, 397 U.S. 532, 538–39 (1970)). Prejudice, however, "might still be presumed under certain specific circumstances," *id.*, including where "compliance with the regulation is mandated by the Constitution" and "where an entire procedural framework, designed to insure the fair processing of an action affecting an individual is created but then not followed by an agency." *Delgado-Corea v. Immigr. & Naturalization Serv.*, 804 F.2d 261, 263 (4th Cir. 1986) (approving of this

11

analysis); *Morgan*, 193 F.3d at 267 (same); *cf. Bowens v. N.C. Dep't of Hum. Res.*, 710 F.2d 1015, 1019 (4th Cir. 1983) ("An agency's violation of its regulations is not unconstitutional unless the regulations are necessary to afford due process.").

Here, although Santamaria Orellana was on release pursuant to a bond prior to the hearing at which he received CAT Withholding, there is no documentation demonstrating the specific legal basis and conditions under which Santamaria Orellana was permitted to be on release while in CAT Withholding status. Nevertheless, based on the known facts, including that Santamaria Orellana was inadmissible under 8 U.S.C. § 1182, Santamaria Orellana was necessarily released pursuant to the authority set forth in 8 U.S.C. § 1231(a)(6) and was therefore subject to the requirements of 8 C.F.R. § 241.4, which on their face apply to decisions to release and to revoke release, regardless of whether the release was based on a formal order of supervision. *See, e.g.*, 8 C.F.R. § 241.4(d) (applying to any decision "to release or detain"); *id.* § 241.4(*l*)(1) (applying to individuals "released under an order of supervision or other conditions of release"); *id.* § 241.4(*l*)(2) (applying to discretionary decisions "to revoke release").

As stated at the hearing, the parties agree that Santamaria Orellana's release was subject to 8 C.F.R. § 241.4 and that those provisions are intended to provide due process to individuals in Santamaria Orellana's position. These regulations plainly provide due process protections to aliens following the removal period as they are considered for continued detention, release, and then possible revocation of release by, among other things, requiring that only certain designated officials make custody determinations; mandating that a noncitizen receive a copy of any decision to release or detain that individual; establishing criteria and factors applicable to detention, release, and revocation determinations; and requiring certain procedural safeguards upon revocation to allow a noncitizen to have an opportunity to be heard to contest the reasons for revocation,

12

including informal interviews and custody reviews. *See* 8 C.F.R. § 241.4. This conclusion is particularly true where the detention or re-detention of noncitizens is necessarily an action that results in the loss of personal liberty that requires due process protections. *See Mathews v. Eldridge*, 424 U.S. 319, 348 (1976) ("The essence of due process is the requirement that 'a person in jeopardy of serious loss (be given) notice of the case against him and opportunity to meet it.'" (citation omitted)); *Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects."). The Court therefore agrees with the parties that these regulations are intended to provide due process in that they are fairly construed to be part of a procedural framework "designed to ensure the fair processing of an action affecting an individual," such that when they are not followed, prejudice is presumed. *Morgan*, 193 F.3d at 267 (citation omitted).

In turn, the record establishes that Santamaria Orellana's re-detention on June 4, 2025 violated several provisions within 8 C.F.R. § 241.4 that are designed to provide procedural due process. First, the record establishes that, at no point, whether at the time of his re-detention on June 4, 2025 or at any point thereafter, has Santamaria Orellana received notification of the reasons for his re-detention, in violation of the requirements within 8 C.F.R. § 241.4 that "[a] copy of any decision . . . to detain an alien shall be provided to the detained alien," and that the decision "set forth the reasons" for that detention. 8 C.F.R. § 241.4(d); *see Ruiz Primero v. Mattivelo*, No. 25-11442-IT, 2025 WL 1899115, at \*5 (D. Mass. July 9, 2025) (noting that a petitioner who was re-detained under 8 U.S.C. § 1231(a)(6) was "constitutionally entitled" to the process set forth in 8 C.F.R. § 241.4(d), which requires that a "decision to retain custody beyond the removal period must 'briefly set forth the reasons for the continued detention'"). This failure is particularly notable because not only did Santamaria Orellana fail to receive such notice, but, as acknowledged

13

at the hearing, there is no written record of the decision at all. In the absence of any written record of ICE's decision, there is no way to know whether Santamaria Orellana's release was revoked pursuant to 8 C.F.R. § 241.4(*l*)(1), for a violation of conditions of release, or pursuant to 8 C.F.R. § 241.4(*l*)(2), based on a discretionary determination by ICE. Such a failure to inform Santamaria Orellana of the basis for the revocation of his release necessarily violates due process because it thwarts his ability to contest that action.

Second, the revocation of Santamaria Orellana's release also violated the requirement that such a decision must be made either by an "Executive Associate Commissioner" or by a "district director." 8 C.F.R. § 241.4(*l*)(2). Respondents have taken the position that while there is no evidence of the basis for the decision to revoke Santamaria Orellana's release, the decision must have been made pursuant to 8 C.F.R. § 241.4(*l*)(2) because they acknowledge that Santamaria Orellana did not violate any conditions of release, as required for revocation under 8 C.F.R. § 241.4(*l*)(1). However, section 241.4(*l*)(2), which permits revocation "in the exercise of discretion when, in the opinion of the revoking official . . . it is appropriate to enforce a removal order," *id.* § 241.4(*l*)(2)(iii), requires that such a determination be made only by an "Executive Associate Commissioner" or, if "the public interest and circumstances do not reasonably permit referral of the case" to that official, by a "district director." 8 C.F.R. § 241.4(*l*)(2). At present, the "Executive Associate Commissioner" referenced in the regulation is the Executive Associate Director of ICE. *See Ceesay*, 2025 WL 1284720, at \*16. It is undisputed, however, that there is no evidence, documentary or otherwise, that the Executive Associate Director, or any district director, made the decision to revoke Santamaria Orellana's decision. Indeed, at the hearing, Respondents' counsel acknowledged that he does not know who made the decision. Where the only evidence on this issue is Santamaria Orellana's undisputed account that, on June 4, 2025, he

14

presented his paperwork to local ICE officers at the Baltimore Field Office, they appeared confused, and they then told him that he was being detained without providing him with the required written notice of a decision made by the Executive Associate Director or a district director, the Court finds that the decision was not made by such an official and may even have been made by those local officers.

Third, to the extent that the revocation of Santamaria Orellana's release was instead based on 8 C.F.R. § 241.4(*l*)(1) due to a failure to comply with conditions of release, it runs afoul of the requirements in that provision that upon such revocation "the alien will be notified of the reasons for revocation" and that "the alien will be afforded an initial informal interview promptly after" the return to custody "to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.4(*l*)(1). It is undisputed that Santamaria Orellana received no such notification or informal interview, whether at the time of his re-detention or at any point since. *See id.*

Fourth, to the extent that Santamaria Orellana was subject to 8 C.F.R. § 241.13, as referenced in the briefs, the revocation of his release violated those regulations as well. 8 C.F.R. § 241.13 arguably could apply to Santamaria Orellana because, where he had a final order of removal, the removal period had expired, and he was released after he received CAT Withholding, it is reasonable to infer that ICE must have made a determination that, at the time of his release, "there was no significant likelihood of removal in the reasonably foreseeable future." 8 C.F.R. § 241.13(a), (b)(1). Under such circumstances, however, upon any revocation of release, the regulation requires that "the alien will be notified of the reasons for revocation" and that ICE "will conduct an initial informal interview promptly . . . to afford the alien an opportunity to respond to the reasons for revocation stated in the notification." 8 C.F.R. § 241.13(i)(3). Again, no such

15

notification or informal interview was ever provided to Santamaria Orellana. Thus, under any of the potential bases for revocation, Santamaria Orellana's re-detention and revoked release violated regulations designed to provide due process.

Several courts addressing similar circumstances have held that a failure to adhere to these regulations violated due process. For example, in *Rombot v. Souza*, 296 F. Supp. 3d 383 (D. Mass. 2017), in which the petitioner had an order of supervision revoked without advance notice at a routine check-in appointment because ICE had determined that there was a significant likelihood of removal in the foreseeable future, the court held that ICE violated the petitioner's due process rights by failing to comply with 8 C.F.R. §§ 241.4 and 214.13, particularly in that the revocation was not ordered by the kind of official required to make that determination, and the petitioner did not receive an informal interview or an opportunity to respond to the reasons for revocation. *Id.* at 385, 387–88. In so ruling, the court found that these regulations were "promulgated to protect a fundamental right derived from the Constitution." *Id.* at 388 (quoting *Waldron v. Immigr. & Naturalization Serv.*, 17 F.3d 511, 518 (2d Cir. 1993)).

In another case, the court similarly held that ICE's revocation of the petitioner's release was unlawful and violated the Due Process Clause where the agency had not demonstrated that an authorized official had ordered the revocation, and ICE had failed to provide the petitioner with an informal interview, in violation of the applicable regulations. *See Ceesay*, 2025 WL 1284720, at *17–20. Citing *Rombot*, the court reasoned that "[t]here can be little argument that ICE's requirement that noncitizens be afforded an informal interview—arguably the most bare-bones form of an opportunity to be heard—derives from the fundamental constitutional guarantee of due process." *Id.* at *19 n.26. Recently, another judge in this District held that, pursuant to *Accardi*, the revocation of release without the approval of an authorized official, the lack of an informal

16

interview and thus an opportunity to be heard, and the failure to schedule a hearing on the petitioner's fear of removal to Mexico violated 8 C.F.R. §§ 241.4, 241.13, and 208.31 and thus violated due process. *See Cordon-Salguero v. Noem*, No. 25-1626-GLR, Mot. Hr'g Tr. at 35–37 (D. Md. June 23, 2025) (Dkt. No. 21).

Here, the record likewise establishes that Santamaria Orellana was not afforded the process required by 8 C.F.R. § 241.4 and 8 U.S.C. § 241.13 before having his release revoked. In one sense, this case presents a more stark case of a violation of due process because, unlike in *Rombot*, *Ceesay*, and *Cordon-Salguero*, there is absolutely no record of the decision to revoke Santamaria Orellana's release, much less one that was presented to him, which reveals an even more significant due process problem because no one—not the Court, not Santamaria Orellana, and not even Respondents—knows with any degree of certainty what legal and factual basis was relied upon in making the determination, which hinders any meaningful challenge to the decision. *See Rombot*, 296 F. Supp. 3d at 385*; Ceesay*, 2025 WL 1284720, at \*4*; Cordon-Salguero*, No. 25-1626-GLR, Mot. Hr'g Tr. at 36. Even so, as discussed above, under any of the potential grounds, the record is clear that ICE's revocation of release violated its own regulations by failing to have an authorized official make the revocation decision, failing to provide Santamaria Orellana with notification of the reasons for his re-detention, failing to provide Santamaria Orellana with an informal interview, or some combination of these deficiencies. Where it is undisputed that the regulations were put in place to provide due process, the Court concludes that Santamaria Orellana has demonstrated that the revocation of his release and thus his ongoing detention are unlawful in violation of the *Accardi* doctrine and violate his right to due process under the Fifth Amendment. As a result, the Court will grant the Petition. Accordingly, it need not and will not reach

17

Santamaria Orellana's remaining arguments as to how the revocation of his release is otherwise unlawful under the APA or under *Zadvydas v. Davis*, 533 U.S. 678 (2001).

Finally, although not necessary to the ruling, the Court takes note of the fact that upon receiving notice of ICE's intent to remove him to Mexico, Santamaria Orellana specifically expressed a fear of removal to Mexico no later than June 6, 2025, but ICE did not provide him with the opportunity for an interview to determine whether he has a reasonable fear of such a removal for over two months and only scheduled such an interview at most two days before the hearing on the Petition. Where an expression of fear of removal to a third country is comparable to an expression of fear of removal to one's home country, such an interview is likely required under 8 U.S.C. § 1231(b)(3)(A) and 8 C.F.R. § 208.31. *See Tomas-Ramos v. Garland*, 24 F.4th 973, 977 (4th Cir. 2022). The fact that Respondents took no steps to provide such an interview for several months, while not directly related to the *Accardi* violation discussed above, underscores the need for greater attention to due process in these type of proceedings.

## CONCLUSION

For the foregoing reasons, the Petition for a Writ of Habeas Corpus will be GRANTED. A separate Order shall issue.

Date:  August 25, 2025

THEODORE D. CHUANG
United States District Judge